Next we have Ralph Janvey in his capacity as a court-appointed receiver for the Stanford Court of Appeals and we have two consolidated appeals for the court this morning with several overlapping issues but I think I can distill most of the issues in this appeal to two really two key questions. First is Libyan Foreign Investment Company or El FICO the other entity in this case an agent of the Libyan government and of the Libyan Investment Authority or we refer to as LIA. The second question is does the commercial activities exception apply to the receiver's causes of action based on El FICO's investment in and redemption of the Stanford International Bank CDs and so I'll start with the agency question first. The two defendants in this case are investment entities they invest and try to grow the state-owned resources in Libya that's their entire purpose. Mr. Shariha who is a Libyan lawyer and who gave testimony in this case on behalf of the defendants said that LIA and El FICO both conduct themselves and this is a quote exclusively in accordance with the national interest of Libya. He went on to say that all exclusively on behalf of and for the benefit of the state. He said that when the Libyan government created El FICO the purpose and the intent of the way they created El FICO was that they would have an active supervisory role over El FICO. He also said that in 2006 when LIA was created it was created for the purpose of taking over the government's active supervisory role and so it's against that backdrop that the district court confronted the question of whether El FICO was an agent of LIA and the Libyan government. Now the district court reviewed the facts in the record the extensive facts in the record regarding the formation of these entities regarding their relationship with Stanford and it concluded that El FICO was in fact the agent of the Libyan government. It found important that the Libyan that the El FICO acted only in the interest of the government. It found important this active supervisory role that was intended and was indeed implemented over El FICO and the district court's conclusion was correct. El FICO unlike a standard corporation was never intended to serve its own interests. It was only intended to serve the interests of Libyan government. It was never in a position to be publicly traded for example. So it was intended to act in the interest of the government not its own interests. Unlike the first investment case we don't have an entity that acts in its own interest separate from the government. We don't have like in Hester an entity whose shares could be purchased by the public. Nobody could own this entity other than the government or an agency of the government as is alleged to have been the case when LIA was implemented. In first investment we had entities who were not in arms length with the government. This is the opposite of arms length with the government. In first investment you had officers who control the day-to-day actions not on behalf of the government but on their own behalf. The defendants own evidence in this case is that the El FICO's day-to-day actions were controlled for the government's benefit which is why this case is like the TMR case the DC Circuit case on which Judge Godbee relied. It was plain in that case that this was essentially this entity in the Ukrainian entity in the TMR case was essentially just an administrative arm of the government. That's what's happening here and what I think is so interesting is that LIA doesn't even argue that LIA is not an agent of the government and part of our argument in the opening brief is LIA is not a person for the same reasons El FICO is not a person. Functionally they have the same goal they do the same thing the only difference between LIA and El FICO is that LIA is interposed between El FICO and the government. That's the only difference between the two entities. Is it still interposed? To this day my understanding your honor is it is still interposed. I meant as of the litigation it there was a change in that relationship wasn't there? Yes to start LIA didn't exist. 1982 is when El FICO was created and it was owned directly by the government at that time. 2006 LIA came into existence. At that point the government actually still owned El FICO it just put LIA substituted LIA as the active supervisor of El FICO. Then in 2007 what's described in the record is that LIA took ownership of El FICO but we actually don't have anything in the record that says the shares were assigned to the legislature. An act of the legislature to say okay now you have all of El FICO and its assets and you own its assets in kind. That's different from a traditional American corporate situation where you would expect there would be some involvement of a board of directors. Another interesting thing that happened in 2006 was the government the legislature in Libya said El FICO and another Libyan investment entity called LAP which would be relevant for another reason LAP and El FICO shall be merged. We don't have any evidence that there was any active boards of directors involved with El FICO and LAP this is just purely a legislative fiat which is not consistent with treating these as separate entities not consistent. Where do we draw the as far as it being a legal decision by the court and we review it de novo and factual findings that the court made in reaching its decision that we review for being clearly erroneous? Well I think the fact the court made some pretty specific factual findings on this point. I think those factual findings are reviewed for clear error and then the implication of those factual findings I think that's where the legal conclusion comes in and I think the district court's perspective on this I believe was I have made these factual findings about the close relationship of these two entities the purposes for which El FICO was performed the type of supervision that it received and then it took all of that together and said okay let me look at the applicable law and looking at the applicable law the question is is this entity treated like a normal entity? Well all those factual findings say it's not. So do you think the factual findings are clearly erroneous or do you think there was a incorrect legal or a combination thereof? There's two different things going on here. So the factual findings as to El FICO I think were correct. I think they were correct. Now the question then becomes what of LIA and here we have a tension within the district court's order. The tension is this the district court said as to LIA I don't think LIA counts as the principal for El FICO because I don't see active day-to-day control by LIA over El FICO and it decided that question under Texas law. The problem is you can still be a principal even if you only have the right to control so that was that was error number one and then as to LIA here's error number two. LIA is interposed between the two entities. If the government is the principal of El FICO it follows because there's no other entity besides LIA between them and El FICO has no other relationship no path to the government except through LIA. It follows that LIA is the principal of El FICO. It just is. Now El FICO may have two principals that is its direct principal and the principal to whom that reports but as a matter of law LIA is the principal of El FICO. It has to be and so my point is the fact were not bought by LIA they were bought by by the other. They were bought in the name of LIA sorry they were bought in the name of El FICO. They were bought in the name of El FICO. However I would say two things about that. Number one is El FICO doesn't own its assets on its own behalf so that it chose to put the assets in its own name is meaningless from an agency standpoint because it's only buying things for the benefit of its principals. And so and the second thing I would say about that is the evidence in the record was as of 2007 the assets of El FICO became the financial resources of LIA. So whether it's in the name of El FICO in our view is of no moment. So the district court's factual findings as to El FICO I think were correct. I think there was legal error that infected its conclusion as to LIA but its conclusion as to El FICO was correct. And so I think the district court should have taken from that that then you look at the commercial activities exception and you analyze the commercial activities exception the same way as to each of them. The same way as to each of them. And so if I could turn to the commercial activities question I think it fundamentally comes down to this. There's a dispute there's a dispute over whether this bank S.I.B. is an Antiguan bank or is it fundamentally a U.S. entity. They have deposits and loans. No never mind. I can't comment on that your honor but the factual finding here's the factual finding from the district court and I think it is well well supported in the record. By doing business with S.I.B. and Antigua El FICO was in reality doing business with Stanford in Houston. That is a factual finding and it's well supported and here's why. The two primary things S.I.B. did that is selling CDs and taking the proceeds and investing them those things were based in the United States. The uncontroverted evidence in the record was the sale of seed the marketing and the sale of CDs the epicenter of that activity was in the United States. The bank accounts for S.I.B. the main operating bank accounts for S.I.B. were in the United States. The treasurer the person who controlled the purse strings who we actually just tried for breach of fiduciary duty in the fall Patricia Maldonado she sat in Houston. She controlled the bank accounts in Houston. She made sure for example that if somebody like the Libyan defendants came in and said I want my money that there would be sufficient assets sitting in a bank account in Canada to be wired out to them. Alan Stanford, James Davis both based in the money she sat in Memphis Tennessee and did the defendants know this? Of course they did. When El Fico made an investment in 2007 of 50 million dollars they sent two people here just preceding that investment. They took an extensive tour of what they referred to as the bank's headquarters in the United States. They visited Miss Pendergast in Memphis Tennessee. They visited in Houston the general counsel. They visited the chief compliance officer of the brokerage there. They went to Miami. They visited the brokerage president in Miami. They visited Alan Stanford's chief of staff Yolanda Suarez. They knew this was a U.S. bank. In 2008 well let me back up and just give you one additional fact. In 2005 and this is from the defendants own production the defendants had a letter dated 2005 from Republican National Republic National Bank the precursor bank to that letter was a reference letter and it said yes we know Alan Stanford and we know Stanford International Bank and they do banking with us here in Houston and so they knew going into the relationship they were dealing with the U.S. bank. Coming out of the relationship they knew they were dealing with the U.S. bank. LIA you remember I referenced LAP Libyan African Investment Portfolio in El Fico. They each invested 50 million dollars into SIB in the fall of 2008. You can count this as coincidence or not but LIA's chief executive decided right on the heels of that to come visit Alan Stanford. Now where did he go? Did he go to Switzerland? Did he go to Antigua? No. He went to Washington D.C. and that's where he met Alan Stanford. They knew who they were dealing with. This was an American bank and the district court's was. What was in Antigua? Weren't they dealing with the bank in Antigua in some way and getting their CDs from there rather than the U.S.? So the bank yes the nominal bank building is in Antigua and if you look at the face of the CDs that they do say executed at St. John's Antigua but the point is this. Where was the bank actually run when the courts in this country have looked at the question of who are you dealing with and where are you dealing with them? For purposes of diversity for example you look at the nerve center. The uncontroverted evidence even from a board of directors member whose testimony is in the record said the nerve center of the operation was in Texas, was in Houston. And so I think what El Fico is arguing for is what you have to make dispositive is the place of incorporation and that can't possibly be the rule. The efficient cause of Mr. Janvey being here in the courtroom this morning is that the U.S. Securities and Exchange Commission took this bank and shut it down. There are four people serving lengthy prison sentences. The U.S. Securities and Exchange Commission found four people to have violated securities laws in this country related to this bank. This is a U.S. bank we can't possibly turn back the clock and say now we're going to just recognize the fiction that this is an Antiguan bank. And the argument coming from the other side is that the court was indulging a fiction but the opposite is true. The court was recognizing the reality. The word reality is even in its finding. So what they want to do is indulge a fiction that this is an Antiguan bank and the U.S. has nothing to do with this but the U.S. is all over this and this is not the kind of case where you would say the U.S.'s connection to this is purely nominal as it was in some of the other cases. Just as an aside, you've not taken the position that El Faiqa is not a foreign state. We have. I think we took that position in the trial court but we have. What do you think it is within the meaning of Section 1603B? Where does it fall as a foreign state? It's a foreign state because it's what? I think the argument that was made in the trial court. What do you say now? Oh, I'm sorry. That it was an agency or instrumentality I believe and I think it also qualifies given its nature as an organ of the foreign state. You would say it's an organ? I would say it's an organ. You don't take issue with that? I don't think so, Your Honor. Okay. I just want to be clear. I see my time is up so. We'll see you in 15 minutes. Thank you. Mr. Polavoy? Close for now? Exactly, Your Honor. May it please the Court, Brian Polavoy, on behalf of the Libyan Investment Authority, LIA, and the Libyan Foreign Investment Company, LIFICO. LIFICO was invested in Stanford International Bank of Antigua and was the largest net loser in this Ponzi scheme. It lost over $84 million in principal. LIA, which is a separate sovereign wealth fund in Libya, located in a different city 50 miles away, founded 25 years after LIFICO, did not invest in Stanford International Bank of Antigua and did not receive any monies from Stanford International Bank of Antigua. What I would like to focus on this morning, something I did not hear at all, is the actual words of the statute. We are here on a case in the Foreign Sovereign Immunities Act. I'm going to focus on the words of the statute, and what the words of the statute tell us is to look at the acts of the specific named defendant and see how, if at all, they fit into one of the exceptions of the Foreign Sovereign Immunities Act. With respect to LIA, I actually think we can deal with it in short order. What we heard this morning was similar to a closing argument, where they marshaled the facts, marshaled them very impressively, put all their facts on the table. All of those facts were argued to the district court. We argued all of our facts to the district court. It was, as Mr. Powers said, after an extensive factual record, and Judge Godbee made factual findings and found in our favor. I will explain when we get in there why those are both correct and certainly not clear error. With respect to LIA, let's turn to the statute. We did not hear whether, with respect to LIA, they were saying that they are going under Clause 1, 2, or 3 of the commercial activities exception. But under any of them, each of them turns on an act or an act of the foreign state or a commercial activity of the foreign state. LIA did not make any act. This action is not based upon, right? The action has to be based upon an act or commercial activity of the foreign state. This action is based upon Lefico's request to Stanford Group Suisse in Zurich, stating, when our CD matures, please wire the proceeds to our account in Tripoli, Libya. That is what the action is based upon. There is no allegation of complaint. There is no fact in the record that says that this action is based upon any act or activity of the Libyan Investment Authority. That should be the end of the story with respect to LIA. Instead, what we have done for years now is fight where their argument is LIA and Lefico are alter egos. LIA is somehow the principle of Lefico. And that is what we heard for most of the 15 minutes. Very well argued. This is our evidence that suggests that LIA and Lefico are somehow the same entity, that one is talking for the other and what have you. All of that, there was an extensive document production. Thousands of documents were viewed in Libya. The documents that were relevant to their claims were produced to them. Arguments were made to Judge Godney brief after brief in appendix after appendix was filed. And his affidavit and the Mokhtar affidavit indicates Lefico operated independently of LIA and was not subject to LIA's control. That's the order at page 20. His finding was based on the evidence. Remember, we had had, there was a preliminary injunction hearing first where they put on a witness. There was examination. There were thousands of documents in the record. Judge Godney also found, page 19, based on the evidence, the Court again concludes, this is on the motion to dismiss, concluding the same as he had concluded on the preliminary injunction motion, the Court again concludes that the receiver has failed to establish that Lefico is LIA's alter ego. The evidence, quote, tends to establish that Lefico and LIA each enjoyed a separate corporate existence. The receiver's, quote, novel evidence fails to persuade the Court that the Leyes and Mokhtar affidavits should not be credited as the most persuasive and well-informed interpretations of the relationship between LIA and Lefico. Now what, isn't Leah the the full shareholder of Lefico? Absolutely. How does that come into the picture? It is, it was at all relevant time, at the time when Lefico started making the investments, the LIA didn't even exist. After Lefico started making the existence, the LIA was created and as a result of Decree 125, it became the 100% shareholder of Lefico. So who owned Lefico before Leah was created? The government of Libya. But my point, Your Honor, is simply this. Going back to the words of the statute, the action is not based upon any act or activity of LIA, period. The only way they try to get past that is by saying it is the alter ego or the agent. Certainly being a 100% owned subsidiary does not make you on its face the agent of your parent. And the court has heard all this at the district court, heard the evidence on both sides, made clear factual findings. So what did we hear in the brief? They said the receiver argues that Mr. Sharia's declaration is quote simply not credible. That's not arguing clear error. It can't be clear error when the district court had sworn evidence and documents in front of it and made factual findings. It's not clear error to say, but he made the wrong mistake because he shouldn't have taken what the chairman of LIA or the chairman of Lefico or a partner in a major law firm in Tripoli says is what these Libyan corporation documents mean. And instead he should have taken the evidence that they had a professor from Austin, an American professor who doesn't have any training in Libyan corporate documents who said no, this is what I think they meant. My point there for LIA is simply if the action is not based upon an act or activity of them, the only way they can prevail and reverse Judge Godby's decision is to say it was clear error, his factual findings with respect to alter ego. They do not come, frankly, Your Honor, if Your Honors have any questions about any one of their specific facts, I'm happy to go into it because everything I heard, we've been debating this for years, they are incorrect. But my point now is since the court, the district court already ruled, it is only if they can show clear error that they win. If I can turn to Lefico, Lefico, of course, did lose its money. Okay. And now we say it lost $84 million in this fraud. How does it differ from other victims? I know that they came out and made, they got some of their money back, but weren't they just ordinary purchasers of the CD? The allegation is a little bit beyond that, that somehow they're different from other purchasers of CD and were involved in some sort of fraud with... No, there's no allegation of wrongdoing. Okay. They were, they differ in that they were the biggest loser. They lost $84 million. When this fraud came down, they had over $100 million left in their account with Stanford International Bank, 84 million of which is principal. So they differ, to them, they differ in an important way, which is that they were the largest loser. But let's look again at the words of the statute. So they're not represent, aren't they part of the class of victims? They would be if they were, if they participate, well, for the next case, they are the biggest victim. So let's look to see how the commercial activities exception could apply to a fraudulent transfer case against them. Would Judge Gandhi correctly found? He said that, quote, the actions and decisions associated with Lefico's investments took place outside the U.S. That's his factual finding. After all this evidence, he said what Lefico did, all of its acts and its commercial activities took place outside the U.S. You've heard a lot to the contrary, but he saw all the evidence and we could go through the evidence that, and I will go through some of it, that showed their acts and activities were outside the U.S. But what he found, the exception he found, and it's the same exception he found applied in the case you're going to hear after this, is that the, that the acts, the acts and activities of Lefico outside the United States had a direct effect in the United States. And from that, he found that as to Lefico, there would be subject matter jurisdiction. That is wrong as a matter of factual findings, wrong as a matter of law, and quite frankly, that is an important precedent for many other cases, this idea of extending this direct effects exception so that it would capture conduct that a foreign state is dealing with another foreign entity on an argument because there was ultimately some effect in the United States. But let's go to the actual words of the statute and the words of the Supreme Court in Weltover, which I think will give us the answer why that was wrong. The, the, the third prong says there will be a commercial act, there will be an exception where the action is based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere, and that act causes a direct effect in the United States. So we have factual findings that say that all of the acts and commercial activities of Lefico were outside the United States. So the question is, is the action based upon an act outside the U.S. and that act causes the direct effect in the United States? And the Supreme Court in Weltover said that an effect is direct if it is the immediate consequence of the defendant's action. All of the cases, this court and Stenna Ruggieri and every case since, that was 31 years ago, say you must focus on the defendant's act, not the act of somebody in Houston, not the act of Alan Stanford, not the act of somebody in Memphis, but on the defendant's act because those cases say the key is predictability. A foreign state has to know if a foreign state is dealing with an entity in another foreign country, it has to have some idea that it's doing conduct that could subject itself to the jurisdiction of U.S. courts and that predictability goes the other way. If another party is dealing with a foreign state, it should know based on the conduct that it is doing whether or not the commercial activities exception is going to apply if it has a suit. So what was, what we haven't heard at all today is what was the act that this action was based upon? The act was in Gharian, Libya, two employees of Lefico sending a fax to Stanford Group Swiss AG, a Swiss company in Zurich, stating, it's two sentences long and they are all in the record, stating upon the maturity of CD number X, please wire the proceeds of that CD to our account at the Libyan foreign bank in Tripoli. That is what the action is based upon. Every circuit court case says you must focus and isolate what the action is based upon. Now, does that fax that goes from Tripoli to Stanford Group Swiss in Zurich cause a direct effect in the United States? What happens as a result of that fax, and I should say, after Weltover, the courts have been clear that when you isolate that act to say what is a direct effect, a consequence, it has to be immediate, right? Weltover says immediate. The D.C. circuit said a consequence is immediate if no intervening act breaks the chain of causation leading from the asserted wrongful act to its impact in the United States. No intervening act. The second circuit said if the effect depends on variables independent of the conduct of the foreign state, it is not a direct effect. So again, we have to focus on what Lefico did and what anyone else did. All I care about is Lefico because those are the only actions Lefico can control. Now, where were the CDs purchased? Through Swiss, by Stanford International Bank of Antigua, and the district court found that Stanford International Bank operated out of Antigua. That's a factual finding. As Mr. Powers conceded, the CDs stayed on their face, executed in Antigua. Lefico worked through Stanford Group Swiss in Zurich. They had their contract was with Stanford Group Swiss, a contract governed by Swiss law, a contract that says the courts of Zurich have exclusive jurisdiction. Their contractual relationship, what they can control, was with Switzerland. Through that contractual relationship, one of the investments they made, a big one, was purchasing certificates of deposit issued by Stanford International Bank Limited, which is organized under the laws of Antigua and which is the district court found operated in Antigua. That is their action. How then is there an effect here in the United States? Well, what Judge Godbee said is by buying those CDs through Antiguan Bank and getting money back, the money was funneled to Houston where the Ponzi scheme, the Ponzi scheme, the enterprise was headquartered or located, and that that caused a direct effect in the United States. Well, it's interesting. The sentence in the opinion is in the passive voice. It's in the passive voice because somebody else did the funneling. It certainly wasn't Lefico. Lefico had, they can argue all they want that Lefico knew it was a Ponzi scheme or knew X or Y. The statute says, look at the acts of the defendant. The acts of the defendant, the activities of the defendant were overseas, and if there was any effect in the United States, remember, first of all, the financial effect is not sufficient in the United States, but if there was any effect in the United States, it comes as a result of Stanford and his cohorts funneling the money out. Here, when we look at the facts, and Judge Godbee went through them in detail, every fact that Lefico had, and the statute, the case law says, looks at the acts of Lefico, every single one of those was outside the United States. Was there a Swiss account with money in it? Yes. Absolutely. The account was at Coots Bank in Switzerland, and frankly, our clients lost more than the amount in the Stanford International Bank. That's what we're getting a clawback action for because certain of the monies were recovered. You know, another affiliate to the Libyan, another sovereign wealth fund, LIAP, lost in excess of $50 million, and I believe our clients lost additional money separate and apart from the Stanford International Bank CDs. I see my time has expired. I'll save the rebuttal. There's no further questions. Thank you, Your Honor. I just want to touch on a few issues. The first is this direct effect argument that the act in question, I don't dispute that the act in question is the redemption of the CDs, but the question is, did it have a foreseeable and direct effect in the United States? The immediate argument implies that it has to happen immediately, temporarily. That's not true. The Supreme Court said foreseeability is not an element. Foreseeability is not a requirement. That's exactly right. That's from the Weltover case. Now, this Court has said in Callejo and in the Voest-Alpine case that foreseeability is actually easier. If you can show foreseeability, then you're in good shape. Was it foreseeable that the redemption of the SIB CD would have a direct effect in the United States? Of course it was. It happened as an unbroken sequence. I demand my money from the bank in the United States. His whole argument is premised on the idea that it's an Antiguan bank, but if it's a U.S. bank, you're not hearing that argument. So the question is, is it functionally a U.S. bank? Is it in reality a U.S. bank? The Court made a factual finding. It is. It is a U.S. bank. So it was foreseeable that this would have a direct effect in the United States, and it did have a direct effect in the United States. There was an argument about there's a financial advisor in Switzerland and all that sort of thing. All that's fine, but the bank, the bank, Stanford International Bank, its bank accounts were here. They were here in the United States. There was no dispute about that. So the effect is direct. It is a foreseeable consequence. It happens. In fact, in this case, it happens within a matter of a couple of days, which is actually a lot shorter than some of the cases that this Court has recognized a direct effect. So as far as the directness of the effect, I don't think there's really any argument that this is a direct effect case. Judge Prado, you asked a question about how are these folks different from some of the investors who lost money. Here is the difference, and if we're back in the trial court, the argument we have is these investors did not have good faith. These are sophisticated investors. This is an investor that's got billions in assets. They've got advisors. They understand what they were into, and they understood what they were into in the fall of 2008 when it became apparent that this was a fraud. It became apparent to sophisticated investors that this was a fraud, and there were some investors, like these defendants here, who realized what they were into, and they got their money out, and they cut in line, and that's not right, and the statute allows us to go and get that money, and that's why we're here. As to the agency point, I just want to touch on that briefly. There was some discussion about credibility of the witnesses and so forth, but here is the bottom line on the agency question. The district court's finding, its factual finding as to El Fico was that it was the agent of the Libyan government. So regardless of whether LIA exercised active day-to-day control, regardless of whether it exercised active day-to-day control, you still nevertheless have a situation where LIA is the principal of El Fico, even if they weren't involved in the initial investment, and we're not suggesting they were. They still had the right to control that investment. They had the right to control the withdrawal activity. That's what makes them the agent, and it's the nature of their relationship based on the factual finding that the district court made as to El Fico that makes LIA the agent. I wanted to just briefly touch on El Fico and the commercial activities exception. I think the other piece of this besides direct effect that you could find for the commercial activities exception applies is prong one of the commercial activities exception. He talked about acts that took place outside the United States that have a direct effect in the United States, and we do have that here, but the statute does not actually require under the first prong that the act of the foreign state take place in the United States. That's prong two of the exception. The commercial activity that is related to our claim is the investment in and the redemption of the Stanford CDs. That relationship, that activity had a substantial connection to the United States. That's not like Stena, where you had Pemex dealing with a platform operation off the coastal waters of Mexico dealing with another Mexican corporation. That's not what this case is. This case is based on the district court's factual finding, is that you have a Libyan state dealing with a U.S. entity, and so its act in asking for a redemption of its CD, that absolutely has a substantial connection to the United States, and there's not a case that they have cited that says otherwise, and certainly I haven't seen a case that says the act of the foreign state for clause one has to actually be within the territorial borders of the United States. I just don't think that's a requirement of the statute, and I think that's very clear. So I think the bottom line, the bottom line for these two appeals is this. The district court made two key factual findings, that El Fico was doing business with Stanford in the United States in Houston, Texas, and that El Fico was the agent of the government. The legal conclusion that follows from that is that LIA is El Fico's principal, and that the commercial activities exception applies to both of them. For that reason, we ask you to reverse the dismissal of the claim against LIA and affirm the order as to El Fico. Thank you, Your Honor. The district court most assuredly did not find that El Fico was dealing with a U.S. entity. The district court was clear that Stanford International Bank Limited was an Antigua entity. What the district court did was say, it said SIB was based in Antigua, but this court has repeatedly recognized that the entirety of the Stanford Ponzi scheme was based and operated out of Houston, Texas. This court in the Jan B. Brown decision, and the district court in two other decisions, has found, has, if you will, morphed all the entities together to say they operate out of Houston. But every one of those decisions is in a choice of law decision, where it makes perfect sense to look at the most relevant contacts and aggregate the entities. When you are talking about jurisdiction, you do not do that. The district court did not do that in Jan B. Alguire, which was a personal jurisdiction case. There, the court said, where did this defendant deal with? Here, we are talking about subject matter jurisdiction and foreign sovereign immunities. You do not simply say we are going to morph all these entities together and ignore the corporate form like we would do in a choice of law case when we are talking about jurisdiction. Here, the factual finding, the facts are clear that Lefico's investments, again, were managed by a Swiss entity under Swiss law, a contract with the entity in Switzerland, and it banked in Switzerland. It had no investments in the U.S. And again, we cannot hear just like you know SIB was a U.S. company, because we do not know SIB was a U.S. company. SIB, Stanford International Bank Limited, was an Antigua company. So our client had no agreements with any U.S. entity. There were no CD payments payable or paid in the U.S. There were no U.S. bank accounts. It is nice to hear that this fraud was being run out of Houston and that there were serious accounts in Houston or in Memphis or in our case, all of the monies were transferred from accounts overseas to other accounts overseas. There was no evidence of U.S. accounts being used. The CDs were issued from an Antiguan bank. There were no money transfers in the U.S. You are correct, Judge Owen, that foreseeability is not a requirement. All we do is we look to the acts of the defendant and we say how, whether it's foreseeable or not, how do the acts of this defendant, if at all, is this action based upon an act of the defendant that gives rise to an immediate effect in the U.S.? Almost all the cases from Weltover on are ones where a foreign state had a contract obligation that was payable in the United States. When it failed to take that action overseas, it causes a direct effect in the United States. There are no cases finding a direct effect in the United States where it is anything other than the foreign state takes an action or doesn't take an action and the harm is felt in the United States. Here, unless you accept this fiction, which the district court did not accept and which for other than choice of law purposes there'd be no reason to accept, but unless you accept the fiction that All Stanford is just one entity and that our client didn't in fact deal with a Swiss entity and invest in an Antiguan company, but instead, regardless of what it did, we're just going to say it was all U.S. entity, unless you accept that fiction, the only way that the monies, that there was a direct effect in the United States is as Judge Gottlieb said. What he said was you invested in an Antiguan entity, but the money was funneled into the United States and out of the United States. And the Foreign Sovereign Immunities Act says we must look at the act of the defendant. Our client, the Libyan Foreign Investment Company, didn't do any of that funneling. There's no direct effect as an immediate consequence without an intervening act of Allen Stanford. There's no direct effect in the United States as a result of them sending that fax to Switzerland unless all these other steps take place and you have the funneling and the criminal acts of Allen Stanford. For those reasons, unless the court has any more questions, the court should affirm the district court's decision based on well-reasoned and accurate facts with respect to LIA, but reverse on the legal issue with respect to LAFICO because it does set a dangerous precedent, Your Honors, if a foreign state, foreign states are engaged in business, commercial activities outside the U.S. where they're dealing with countries all over. There oftentimes can be some U.S. part of the, a U.S. could be a parent of that company, a U.S. could be, there could be a U.S. affiliate of that, but when a foreign state is dealing with a U.S. affiliate, the court has accepted that all of the acts and commercial activities of that foreign state are outside the United States to suggest that there is a, to just so quickly and blithely, fastly to say, oh no, there's a direct effect in the United States because the bad guys were headquartered in the United States and they funneled the money out. That sets a dangerous precedent. Thank you, Your Honors.